IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,002

In the Matter of JOHN P. BISCANIN,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed March 24, 2017. Two-year suspension, stayed after 6 months; respondent then to be placed on 2 years' supervised probation.

*Stanton A. Hazlett*, Disciplinary Administrator, argued the cause and was on the brief for the petitioner.

*Steven R. Smith*, of Gates Shields Ferguson Hammond, P.A., of Overland Park, argued the cause and was on the brief for respondent, and *John P. Biscanin*, respondent, argued the cause pro se.

*Per Curiam*:  This is a contested original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, John P. Biscanin, of Kansas City, an attorney admitted to the practice of law in Kansas in 1968.

On June 16, 2015, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on July 24, 2015, and an amended answer on September 14, 2015. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on September 25, 2015, where the respondent was personally present and represented by counsel. The hearing panel determined that the respondent violated KRPC 1.8(a) (2017 Kan. S. Ct. R. 307)

1

(conflict of interest), 1.15(a) and (b) (2017 Kan. S. Ct. R. 326) (safekeeping property), and 1.15(d)(1) and (d)(2) (preserving client funds).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"8.      In 2010, R.K. retained the respondent to represent him concerning the estate of a friend, M.S. M.S. died March 10, 2010, leaving a holographic will that left the bulk of M.S.'s estate to R.K. The respondent agreed to represent R.K. on a one-third contingency fee basis.

"9.      The administration of M.S.'s estate was complicated because after she executed the holographic will leaving the bulk of her estate to R.K., M.S. executed a subsequent will. In the subsequent will, M.S. left the bulk of her estate to K.D., another friend of M.S. The same day M.S. executed the subsequent will, M.S. had a stroke. It appears that M.S. lacked the requisite mental capacity for the subsequent will to be valid. In addition, M.S. also left a half-brother, D.S. D.S. was M.S.'s sole legal heir. According to R.K., M.S. intended to disinherit D.S. D.S. contested the two wills and sought administration of M.S.'s estate through intestate succession.

"10.      K.D., D.S., and R.K. settled the dispute over M.S.'s estate. As a result of the settlement agreement, R.K. received a lump sum payment of $34,350, a Harley-Davidson motorcycle, and up to $70,000 in settlement proceeds from a pending wrongful death case regarding M.S.'s husband who died in 2006.

2

"11.     On March 8, 2011, the respondent received a check in the amount of $34,350 for R.K. in conjunction with the settlement of M.S.'s estate. The respondent deposited the settlement proceeds into his attorney trust account.

"12.     On March 23, 2011, the respondent issued a check to R.K., in the amount of $10,000. On April 8, 2011, the respondent issued a second check to R.K., in the amount of $13,447. The balance in the respondent's trust account was the respondent's fee. [Footnote:  The respondent agreed to a one-third contingent attorney fee. One-third of $34,350 is $11,450. However, only $10,903 remained after R.K. received his share. A note on Exhibit 6, p. 95 explains the difference. The note provides '2/3 of settlement + $547.' Two-thirds of $34,350 is $22,900. Adding $547 to $22,900 is $23,447, the amount paid to R.K. It is unclear what the $547 referenced.]

"13.     R.K. received the checks and cashed the checks. Later, R.K. asked the respondent to hold $10,000 in cash. The respondent agreed to hold the money on behalf of R.K. The respondent did not deposit the $10,000 in his attorney trust account. Rather, the respondent placed $10,000 cash in a safe located in the respondent's office. At some point, at the request of R.K., the respondent returned the money to R.K.

"14.     Later, R.K. again gave the money to the respondent a second time. The respondent testified that R.K. asked him to hold it on his behalf. R.K. testified that the respondent asked to borrow $10,000 to invest in a bar. Regardless of how it came to be, the respondent again held R.K.'s $10,000 for him.

"15.     The respondent did not deposit the entire $10,000 into his attorney trust account. However, it appears that on September 18, 2012, the respondent deposited $8,000 cash held on behalf of R.K., into his attorney trust account.

"16.     The respondent agreed to pay R.K. 6% per annum on the $10,000. The respondent testified that he executed a promissory note, but the respondent was unable to locate the promissory note. The respondent testified that he agreed to pay R.K. 6% per annum on the $10,000 and created a promissory note, not because it was a business

3

transaction or a loan, but because he wanted to show R.K. that someone did care for him and wanted to do something for him.

"17.     The hearing panel finds the respondent's explanation of the agreement to pay 6% per annum and the purported promissory note to be unbelievable. Rather, the hearing panel finds that the respondent agreed to pay R.K. 6% per annum on the $10,000 because the respondent and R.K. entered into a business transaction. The respondent did not inform R.K. that he had the right to and should seek independent counsel to advise him regarding the business transaction. Additionally, the respondent did not seek a waiver of the conflict of interest from R.K.

"18.     From time to time, R.K. asked the respondent to pay the interest on the $10,000. Additionally, from time to time, R.K. asked the respondent to pay the principal amount of $10,000. The respondent failed to pay R.K. the principal and interest as requested by R.K.

"19.     Because the respondent failed to pay the $10,000 and interest, on November 3, 2014, R.K. filed a complaint with the disciplinary administrator's office. Thereafter, on December 18, 2014, the respondent paid R.K. $11,966.81, for the principal and interest. In addition, the respondent paid R.K. $317.42, as the remaining amount held in trust for R.K.

"20.     In accordance with the settlement of M.S.'s estate, in addition to the $32,350, the respondent also received $70,000 on behalf of R.K., as follows:

| Date Deposited into Attorney Trust Account | Amount |
|---|---|
| June 22, 2012 | $15,344.13 |
| July 6, 2012 | $427.55 |
| September 18, 2012 | $2,138.15 |
| January 8, 2013 | $19,642.37 |
| January 9, 2013 | $2,161.06 |
| March 15, 2013 | $10,721.32 |

4

| | |
|---|---|
| July 25, 2013 | $19,565.42 |
| TOTAL | $70,000.00 |

"21.     The respondent's one-third contingent attorney fee from the $70,000 was $23,333.33. However, from the records, it is unclear when the respondent removed his attorney fees from the attorney trust account.

"22.     R.K. should have received $46,666.67 of the $70,000. It appears that R.K. received $41,644.26 as follows:

| Date Amount Paid | Amount |
|---|---|
| August 13, 2012 | $10,086.90 |
| October 18, 2012 | $11,425.00 |
| October 30, 2012 | $150.00 |
| February 1, 2013 | $14,686.00 |
| July 10, 2013 | $5,296.36 |
| TOTAL | $41,644.26 |

"23.     In addition to the amounts paid to R.K., it appears that the respondent paid out attorney fees to Philip Carson, attorney fees for additional representation to the respondent, and a bond, as follows:

| Date | Recipient | Amount |
|---|---|---|
| April 23, 2013 | Respondent | $2,500.00 |
| May 3, 2013 | Philip Carson | $415.00 |
| June 24, 2013 | Philip Carson | $811.18 |
| July 25, 2013 | Respondent | $5,000.00 |
| July 31, 2013 | Respondent | $1,000.00 |
| November 22, 2013 | Respondent | $1,000.00 |
| December 9, 2013 | Metro Bonding | $1,500.00 |
| August 1, 2014 | Respondent | $500.00 |
| TOTAL | | $12,726.18 |

5

Whether the respondent was authorized to make the payments reflected in this paragraph is unclear from the record.

"*Conclusions of Law*

"24.    Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.8 and KRPC 1.15, as detailed below.

"KRPC 1.8

"25.    KRPC 1.8(a) provides:

'(a)    A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1)    the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client; and

(2)    the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3)    the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the

6

transaction, including whether the lawyer is

representing the client in the transaction.'

In this case, the respondent borrowed $10,000 from R.K., agreed to pay R.K. 6% per annum, and, according to the respondent, executed a promissory note. The respondent failed to advise R.K. of the desirability of seeking independent counsel. Further, R.K. did not provide written informed consent, as required by KRPC 1.8(a)(3). As a result, the hearing panel concludes that the respondent violated KRPC 1.8(a).

"KRPC 1.15

"26.     Lawyers must keep the property of their clients safe. *See* KRPC 1.15. In pertinent part, that rule provides:

'(a)     A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

'(b)     Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

. . . .

7

'(d)     Preserving identity of funds and property of a client.

(1)     All funds of clients paid to a lawyer or law firm, including advances for costs and expenses, shall be deposited in one or more identifiable accounts maintained in the State of Kansas . . .

(2)     The lawyer shall:

. . . .

(iii)    Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accountings to the client regarding them.

(iv)    Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.'

The respondent failed to deposit R.K.'s funds into the respondent's trust account, the respondent failed to maintain complete attorney trust records, and the respondent failed to promptly return the funds R.K. was entitled to receive. As such, the hearing panel concludes that the respondent violated KRPC 1.15(a), KRPC 1.15(b), KRPC 1.15(d)(1), and KRPC 1.15(d)(2), as follows:

8

a.    In his amended answer, the respondent admitted that he violated KRPC 1.15(a) and KRPC 1.15(d)(1) when he failed to deposit R.K.'s funds into his attorney trust account. The hearing panel further finds that the respondent violated KRPC 1.15(a) when he failed to maintain complete attorney trust account records.

b.    The respondent violated KRPC 1.15(b) when he failed to promptly deliver to R.K. the funds R.K. was entitled to receive.

c.    Finally, the hearing panel concludes that the respondent violated KRPC 1.15(d)(2) when he failed to maintain complete records of his attorney trust account and when he failed to promptly return R.K.'s funds which R.K. was entitled to receive.

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"27.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"28.    *Duty Violated*. The respondent violated his duty to his client to refrain from engaging in conflicts of interest and his duty to his client to properly safeguard his client's property.

"29.    *Mental State*. The respondent knowingly violated his duties.

"30.    *Injury*. As a result of the respondent's misconduct, the respondent caused R.K. actual injury.

9

"31.    *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

a.    Prior Disciplinary Offenses. On September 12, 2014, the respondent entered into the attorney diversion program with the disciplinary administrator's office for having violated KRPC 1.3, KRPC 1.4, and KRPC 8.1. The hearing panel concludes that the respondent's prior disciplinary offense is particularly aggravating as the respondent was participating in the attorney diversion program at the time the respondent failed to pay R.K. the money owed to him.

b.    Dishonest or Selfish Motive. The respondent's misconduct was motivated by selfishness. The respondent borrowed $10,000 from his client and did not repay the money when asked to do so. Accordingly, the hearing panel concludes that the respondent's misconduct was motivated by selfishness.

c.    A Pattern of Misconduct. The respondent engaged in a pattern of misconduct when he failed to maintain proper trust account records, when he failed to repay the money when R.K. asked him to do so, and when he repeatedly failed to deposit client funds in his attorney trust account.

d.    Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process. At the hearing on the formal complaint, on many occasions, the respondent attempted to evade directly answering questions. The respondent was surly and argumentative. Additionally, the respondent was deceptive during this testimony. The respondent's testimony included the following exchange:

'A.    [By the respondent] . . . So that's the position of public administrator.

10

'Q. [By Mr. Smith] And you say you're not doing that at this point in time?

'A. Well, the judge, Judge Lynch now is – the office was retained and up to the point in time Judge Lynch has saw fit to spread that over a number of other people. I'm one of them, but now it's spread out among other people.

'Q. So it's not that you were removed for any reason, it was just that he changed the system somewhat?

'A. Judge Lynch, Kathleen Lynch, yeah, she did.'

The respondent's testimony was false. According to the facts included in the diversion agreement, the respondent's testimony was false. The hearing panel is troubled by the respondent's attempt at deception through this testimony.

e. Refusal to Acknowledge Wrongful Nature of Conduct. The respondent refused to acknowledge a portion of his misconduct. The respondent admitted that he did not properly safeguard R.K.'s property. However, the respondent refused to acknowledge that he had improperly entered into a business transaction with R.K. Further, the respondent refused to acknowledge that he failed to maintain proper trust account records and that he failed to timely return R.K.'s funds to him. Accordingly, the hearing panel concludes that the respondent refused to acknowledge the wrongful nature of a portion of his misconduct.

f. Vulnerability of Victim. R.K. was vulnerable to the respondent's misconduct.

g. Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1968. At the time of the misconduct, the respondent has been practicing law for more than 40 years.

11

"32.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found no mitigating circumstances.

"33.     In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

    '4.12    Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

    '4.32    Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.'

"*Recommendation*

"34.     The disciplinary administrator argued that if the respondent was negligent when he committed the misconduct then published censure would be warranted. The disciplinary administrator also argued that if the respondent engaged in the misconduct knowingly, then a period of suspension was warranted and the hearing panel must consider whether to recommend that the respondent's plan of probation be adopted. Finally, the disciplinary administrator did not object to consideration of the respondent's plan of probation. The disciplinary administrator made recommendations for additions to the plan of probation.

"35.     Despite providing a plan of probation, the respondent recommended that he be censured by Kansas Supreme Court.

12

"36. It is clear from all the evidence presented at the hearing on the formal complaint that the respondent was not forthright during his testimony. Additionally, the hearing panel notes that the respondent demonstrated a surly approach and attitude during the hearing. The respondent failed to appreciate the injury which his misconduct caused R.K., his client. The factors in aggravation convince the hearing panel that a period of suspension is warranted.

"37. The hearing panel recommends that the Supreme Court issue an order suspending the respondent's license for a period of 2 years. The hearing panel further recommends that after a period of 3 months suspension, that the respondent be placed on supervised probation for a period of 2 years. The hearing panel concludes, however, that the respondent's current plan of probation is not substantial and detailed enough to cure the problems which arose during this case.

"38. Within 30 days of the date of this report, the hearing panel recommends that the respondent and his counsel provide an amended plan of probation to the disciplinary administrator which is substantial and detailed [and] addresses the concerns expressed by Mr. Walczak during the hearing.

"39. The hearing panel recommends that the respondent propose a different practice supervisor. John L. Peterson supervised the respondent under the attorney diversion agreement. While the respondent was subject to the supervision in the attorney diversion agreement, the respondent engaged in the misconduct in this case. The hearing panel recommends that the new practice supervisor proposed by the respondent be someone who can also work with the respondent on his trust account issues. The hearing panel concludes that Lesley Johnson is not aware of the duties and responsibilities of lawyers with regard to attorney trust accounts and is not an appropriate person to supervise the respondent regarding attorney trust account issues.

"40. The hearing panel further recommends that the respondent immediately put the amended plan of probation in effect and continue to comply with the amended plan of probation.

13

"41.     Kan. Sup. Ct. R. 211(g)(5) provides:

'Prior to the oral argument before the Supreme Court pursuant to Kan. Sup. Ct. R. 212, the Respondent shall provide an affidavit to the Disciplinary Administrator and the Clerk of the Appellate Courts that states that the Respondent is in compliance with the terms and conditions of the proposed probation plan. . . .'

The hearing panel recommends that the respondent provide the Court with a copy of his amended plan of probation at the time he complies with Kan. Sup. Ct. R. 211(g)(5).

"42.     Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## ANALYSIS

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties to determine whether violations of the KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Kansas Supreme Court Rule 211(f) (2017 Kan. S. Ct. R. 251). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

The respondent was given adequate notice of the formal complaint, to which he filed an answer, and respondent was also given adequate notice of the hearing before the panel and the hearing before this court. The respondent filed exceptions to the hearing panel's final hearing report. When exceptions are taken to a hearing panel report, "[t]his

court does not reweigh the evidence or assess the credibility of witnesses. 'Rather, this court examines any disputed findings of fact and determines whether clear and convincing evidence supports the panel's findings. If so, the findings will stand. [Citations omitted.]'" *In re Hawkins*, 304 Kan. 97, 117-18, 373 P.3d 718 (2016) (quoting *In re Trester*, 285 Kan. 404, 408-09, 172 P.3d 31 [2007]); see *In re Bishop*, 285 Kan. 1097, 1105-06, 179 P.3d 1096 (2008).

Unlike the standard for proving attorney misconduct, the panel does not need clear and convincing evidence to consider aggravating and mitigating factors when selecting an appropriate disciplinary option. *In re Hall*, 304 Kan. 999, 1013, 377 P.3d 1149 (2016). Nevertheless, some evidence of those circumstances must be presented for weighing. 304 Kan. at 1014.

In applying these standards, we have organized the parties' arguments into three issues: (1) Does clear and convincing evidence support the hearing panel's finding that the respondent violated KRPC 1.8(a) (2017 Kan. S. Ct. R. 307) (conflict of interest)? (2) Does clear and convincing evidence support the panel's finding that the respondent violated KRPC 1.15 (2017 Kan. S. Ct. R. 326) (safekeeping property)? and (3) What is the appropriate discipline?

ISSUE 1: *Does clear and convincing evidence exist to support the panel's findings that the respondent violated Rule 1.8(a)?*

The hearing panel found that the respondent violated KRPC 1.8(a). The rule, quoted in full in paragraph 25 of the hearing panel report, prohibits lawyers from entering into certain business transactions with clients unless the lawyer and client meet certain conditions. The respondent takes exception to the panel's finding that he violated KRPC 1.8(a), arguing he did not enter into a business transaction with R.K. but merely held

15

$10,000 at R.K.'s request. At the panel hearing, R.K. and the respondent presented conflicting testimony regarding the purpose of the arrangement.

R.K. testified on direct examination that the respondent contacted R.K. and asked for a loan of $10,000 to buy a bar with two other partners. R.K. agreed and gave $10,000 to the respondent in various cash denominations. He also testified that the respondent agreed to give R.K. an "I.O.U." as a receipt and that the respondent said he would pay 6 to 8% interest every 4 months, $600 every 4 months, or give R.K. a job. R.K. also stated at the hearing that the respondent never provided him with documentation.

The respondent testified that R.K. asked the respondent to hold the $10,000, all in $100 bills, for safekeeping. He indicated that R.K. did not trust banks, his friends, or his family to hold the money. The respondent agreed to hold the money and also agreed to pay 6% interest for the period of time he had the money. The respondent admitted to executing a promissory note when R.K. gave him the $10,000, but at the time of the hearing the respondent could not find the promissory note. The respondent testified he executed the promissory note to act as "evidence and proof . . . that I was holding his money and if he died someone would know about that." When asked why he drafted a promissory note, rather than a receipt, he stated that he did not "give it much thought at that point in time."

The record indicates that the respondent paid interest to R.K. After the Disciplinary Administrator instituted proceedings against the respondent, the respondent gave R.K. a notarized receipt reflecting that respondent made a payment to R.K. for three items. First, the respondent transferred $10,000 to R.K. in $100 bills. Second, the respondent paid $317.42 by check from the respondent's trust account, which was the "remainder of funds held in trust by him for my legal representation and attendant

16

expenses." Third, the respondent paid, by check, "$1,966.81 from the business account of [the respondent] . . . which amount represents 6% interest accrued on $10,000.00 from January, 2012 through December 31, 2014."

Based on this evidence, the hearing panel found "the respondent's explanation of the agreement to pay 6% per annum and the purported promissory note to be unbelievable." The panel further found that the respondent agreed to pay interest because "the respondent and R.K. entered into a business transaction."

This finding regarding the existence of a business transaction rests on two facts about which the respondent testified:  (1) He paid interest on the $10,000 and (2) he documented the arrangement by drafting a promissory note. Nevertheless, the respondent urges us to set aside the finding on the grounds it is based on a tainted view of his credibility. The respondent points to a finding made by the hearing panel when discussing the appropriate discipline to be imposed, namely the panel's finding of an aggravating factor based upon the "many occasions [where] the respondent attempted to evade directly answering questions. The respondent was surly and argumentative. Additionally, the respondent was deceptive during this testimony."

Giving an example of the respondent's deceptive testimony, the panel discussed testimony related to a diversion agreement the respondent had entered into as the result of a different disciplinary complaint. In the diversion agreement, the respondent stipulated that he failed to appear at several court proceedings related to a probate case in which he served as a public administrator and that the probate judge "unilaterally appointed a new administrator in April, 2013." Apparently, the panel believed that the respondent had been removed from serving as a public administrator in *all* cases because it explicitly found he gave false testimony during the disciplinary hearing when he indicated that he,

17

along with several other attorneys, currently acted as public administrators. The respondent and the Disciplinary Administrator agree that the panel confused the respondent's removal as administrator in *one* case to mean he no longer serves as a public administrator in *any* case. The Disciplinary Administrator concedes the respondent's testimony regarding his continuing service as a public administrator was not false.

Our review of the documentary evidence related to the diversion agreement leads us to agree that the hearing panel apparently misinterpreted the situation, although it is understandable how the confusion arose because there is a great deal of ambiguity in the testimony and evidence. Nevertheless, the panel reached the wrong conclusion about the respondent's testimony on this one point. See *Hall*, 304 Kan. at 1014 (hearing panel does not need clear and convincing evidence to support finding of an aggravating factor but must have some evidence).

The respondent argues this misunderstanding cannot be compartmentalized so as to effect only the consideration of aggravating circumstances. Instead, he argues, the finding taints the panel's assessment of his credibility. He further argues we cannot conclude that clear and convincing evidence supports the panel's conclusion that he violated KRPC 1.8(a) because we cannot rely on the panel's credibility determination. Alternatively, in his brief he suggested we must remand the proceeding to allow the panel to assess how its misinterpretation of the evidence impacted its weighing of the evidence. But at oral argument, the respondent withdrew his request for a remand and instead argued that we must simply disregard any evidence that depended on a credibility determination. He submitted that once we had done so, there would not be clear and convincing evidence of a KRPC 1.8(a) violation.

18

We can, as respondent suggests, simply examine the evidence about which there is no dispute and determine if that evidence presents clear and convincing evidence of a violation. As relevant to the determination of whether the respondent entered into a business transaction with R.K., we have the respondent's own testimony that he promised to pay 6% interest, he prepared and executed a promissory note documenting that agreement, and he did in fact pay interest when he returned the $10,000. While R.K.'s testimony differs on some points, he also testified that the respondent agreed to provide interest or other benefits and that the respondent actually paid the interest. The record also includes a receipt documenting the interest payment. We conclude these circumstances constitute clear and convincing evidence establishing a violation of KRPC 1.8(a) and do not require any determination of credibility.

KRPC 1.8(a) prohibits a "business transaction with a client" unless (1) the terms are fair and reasonable, fully disclosed, and transmitted in writing; (2) the client is advised in writing of the "desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel"; and (3) "the client gives informed consent, in writing." The respondent does not dispute that these conditions were not met; his argument focuses solely on whether he entered into a "business transaction" in the first place. While KRPC 1.8(a) does not define "business transaction," Comment 1 to KRPC 1.8 broadly refers to a "financial transaction with a client" as a type of business transaction covered by the rule. The respondent tries to limit his "financial transaction" to a loan by focusing on the dispute about whether R.K. asked the respondent to hold the $10,000 or the respondent asked to borrow the money to invest in a bar. This limited focus ignores the language in the Disciplinary Administrator's formal complaint against the respondent, which alleged that the respondent entered "into a business transaction, loan arrangement, *or similar transaction*." (Emphasis added.)

19

Regardless of the purpose behind the arrangement, once the respondent agreed to pay interest for the period of time he held R.K.'s money and executed a promissory note, he entered into a financial transaction with R.K. and formed a business relationship outside the course of the respondent's representation of R.K. Certainly, that transaction had all the indicia of a loan. See *Federal Farm Mortgage Corp. v. Bolinger*, 152 Kan. 700, 703, 108 P.2d 492 (1940) ("[A] promissory note is the primary evidence of the indebtedness."); *Gregory v. Williams*, 106 Kan. 819, 820, 189 P. 932, 933 (1920) ("[t]hat a promissory note is not in and of itself an indebtedness, but is evidence of such indebtedness"); *Capital Co. v. Merriam*, 60 Kan. 397, 401, 56 P. 757, 758 (1899) ("A payment of interest is regarded as an acknowledgement of the debt."); see also *Coe, Administratix v. First National Bank & Trust Co.*, 219 Kan. 352, 355, 548 P.2d 486 (1976) ("A loan is made when the borrower receives money over which he exercises dominion and which he expressly or impliedly promises to return."). But even if the respondent and R.K. did not agree on a loan, a transaction in which one party agrees to pay interest is similar to a loan and falls within the broad meaning of a business relationship.

Thus, the hearing panel heard clear and convincing evidence of a business transaction. Accordingly, we accept the hearing panel's findings and conclusions of law that the respondent violated KRPC 1.8.

ISSUE 2: *Does clear and convincing evidence exist to support the panel's findings that the respondent violated KRPC 1.15?*

KRPC 1.15, quoted in pertinent part in paragraph 26 of the hearing panel report, requires an attorney to safeguard client property by, among other things, keeping the client's property separate from the lawyer's own property, depositing funds in the lawyer's

trust account, keeping complete records, and promptly returning and accounting for the property.

The hearing panel concluded that the respondent violated KRPC 1.15(a) and KRPC 1.15(d)(1) when he failed to deposit R.K.'s funds into his attorney trust account. The panel further found that the respondent violated KRPC 1.15(a) when he failed to maintain complete attorney trust account records. The respondent does not take exception to these findings. But he does take exception to the panel's finding that he violated KRPC 1.15(b) and 1.15(d)(2)(iv) by failing to promptly return R.K.'s funds.

The respondent argues he first learned of R.K.'s demand for the funds when he received the disciplinary complaint and asserts that he returned the $10,000 to R.K. within approximately 6 weeks. He argues this payment was "prompt." The Disciplinary Administrator counters there is evidence that it took 8 months for the respondent to pay R.K. after the first demand or, alternatively, that 6 weeks is not prompt.

A determination that the respondent delayed the delivery of the $10,000 for 8 months arguably requires an assessment of credibility. But the respondent's testimony and the written evidence clearly and convincingly establish a delay of approximately 6 weeks between the complaint and the delivery of the funds. In light of this clear and convincing evidence, the question becomes whether a 6-week delivery period constituted a "prompt" delivery of the client's funds.

Neither KRPC 1.15 nor our caselaw provide a clear test for answering that question. In a past case, this court has found a delay of 10 months to be a violation of KRPC 1.15. See *In re McPherson*, 287 Kan. 434, 440, 445-46, 196 P.3d 921 (2008) (10-month delay in returning retainer after divorce client notified the attorney of the couple's reconciliation). And certainly, a 6-week delay would be less than the time at

issue in that case. Nevertheless, KRPC 1.15 directs the lawyer to "promptly deliver" the property, and "prompt" is defined in this sense to mean: "1. On time: PUNCTUAL. 2. Done without delay." Webster's II New College Dictionary 885 (1995). Whether one acts on time and without delay will often be determined by the particular circumstances of a transaction.

Here, as the respondent testified, he was undisputedly obligated to return at least $10,000 to R.K. Both R.K.'s and the respondent's testimony indicates the respondent was obligated to return the money on demand. Under those circumstances, the terms "on time" and "without delay" would mean that the $10,000 should have been returned to R.K. immediately or, at least, very soon after R.K. made it clear in his November 3, 2014, complaint filed with the Disciplinary Administrator that he wanted his money returned. The Disciplinary Administrator's office transmitted the complaint to the respondent via a letter dated November 6, 2014. On November 26, 2014, the Disciplinary Administrator's office sent a second letter, noting: "It has now been well over 15 days since that letter was mailed to you and to date this office has not received a response." The second letter indicated a formal complaint would be filed unless a response was received within 10 days. On December 5, 2014, the respondent wrote the Disciplinary Administrator's office and said he would respond by December 12, 2014. Then, on December 17, 2014, the respondent sent a letter to the office of the Disciplinary Administrator addressing the complaint. The next day, R.K. signed a receipt acknowledging he had "[i]n hand received from John P. Biscanin" the $10,000 cash and the two checks, one for funds held in trust related to the respondent's representation and the other from the respondent's business account.

The respondent does not dispute that he timely received the November 6 letter or the November 26 follow up letter. And he readily admits it took him 6 weeks to return the

22

money once he had notice of the demand. He explains the delay between notice and return of funds, claiming that during this time he recovered from his "shock" over the complaint, had his accountant calculate interest on the $10,000, and assembled documents for the Disciplinary Administrator. And, indeed, the respondent's response was lengthy and included 125 pages of attachments. Yet from his first reading of the complaint the respondent knew he needed to promptly return $10,000, even if his lack of recordkeeping made it difficult for him to determine what funds he held for R.K. in his trust account.

An additional circumstance weighs on the assessment of whether respondent promptly returned the $10,000. On September 12, 2014, just a few weeks before this current complaint, the respondent had executed the diversion agreement related to the prior disciplinary complaint against him. As part of that diversion agreement, the respondent was required to comply with certain terms and conditions for a 12-month period; those terms included providing information to the Disciplinary Administrator and cooperating with any investigation by the Disciplinary Administrator's office. We do not suggest that the respondent's delay in responding to the November 6 and November 26, 2014, letters violated his diversion agreement or provided a separate ground for discipline. Nevertheless, it weighs heavily in our consideration of whether the respondent "promptly delivered" the $10,000 to R.K. Given that the ink was barely dry on the respondent's diversion for an ethical violation, he should have been extremely diligent in returning at least the $10,000 as quickly as possible. He was not.

The hearing panel determined, based on the above evidence, that the respondent violated KRPC 1.15(b) and (d)(2). We agree with the panel and conclude that clear and convincing evidence exists for the hearing panel to conclude that the respondent violated

those rules by failing to promptly return client funds. Accordingly, we sustain the hearing panel's findings of fact and conclusions of law.

ISSUE 3: *What is the appropriate discipline?*

The only remaining issue before us is the appropriate discipline for the respondent's violations. At the hearing before the panel, the Disciplinary Administrator suggested that published censure would be appropriate if the panel found the respondent was negligent. The Disciplinary Administrator further suggested that a period of suspension was warranted if the panel found the respondent acted knowingly. The respondent requested published censure, but he presented an alternative plan of probation.

The hearing panel, in its final hearing report, recommended the respondent's license be suspended for a period of 2 years and that after a period of 3 months, the respondent be placed on supervised probation for a period of 2 years. Having concluded the respondent's proposed plan of probation was not substantial and detailed enough to cure the problems which arose during this case, the hearing panel recommended that, within 30 days of the date of the final hearing report, the respondent provide an amended plan of probation which is substantial, detailed, and addressed the concerns expressed by the Disciplinary Administrator's office during the hearing, including the naming of a different proposed supervising attorney, the immediate implementation of the amended probation plan, the filing of an affidavit with the Disciplinary Administrator and the Clerk of the Appellate Courts pursuant to Kansas Supreme Court Rule 211(g)(5) (2017 Kan. S. Ct. R. 251), and the filing of his amended plan of probation along with his Rule 211 affidavit.

The respondent filed his amended plan of probation, which included a different supervising attorney, and his affidavit indicating the plan had been implemented.

At the hearing before this court, at which the respondent appeared, the Disciplinary Administrator recommended that respondent be suspended from the practice of law for 2 years—including a period of actual suspension and 2 years of probation. The Disciplinary Administrator also recommended an independent audit to determine if the respondent possesses additional client funds belonging to R.K. The respondent requested published censure.

The recommendations of the hearing panel and office of the Disciplinary Administrator are advisory only and do not prevent us from imposing greater or lesser sanctions. Kansas Supreme Court Rule 212(f) (2017 Kan. S. Ct. R. 255); see *In re Holste*, 302 Kan. 880, 888, 358 P.3d 850 (2015). A majority of this court rejects the hearing panel's recommended discipline of 2 years' suspension, with a truncated period of 3-months' suspension and supervised probation for a period of 2 years. While we unanimously agree on the appropriateness of a 2-year suspension with some portion being stayed while the respondent serves a 2-year period of probation, a majority of the court would require the respondent to serve a 6-month suspension before the stay.

Additionally, we agree with the Disciplinary Administrator's office that an independent audit of the respondent's client trust account is appropriate in this case. Accordingly, the respondent is ordered to file an amended probation plan with the Disciplinary Administrator before the start of his probation period, which shall include a provision for an independent audit to assess whether the respondent still possesses client funds belonging to R.K. The respondent shall also comply with Kansas Supreme Court Rule 218 (2017 Kan. S. Ct. R. 262). Before reinstatement is allowed, the respondent shall

comply with Rule 219(b) (2017 Kan. S. Ct. R. 263) (verified petition for reinstatement). A reinstatement hearing shall not be required.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that JOHN P. BISCANIN be and he is hereby disciplined by suspension for a period of 2 years in accordance with Kansas Supreme Court Rule 203(a)(2) (2017 Kan. S. Ct. R. 234).

IT IS FURTHER ORDERED that the above suspension be stayed after 6 months, at which time the respondent will be placed on supervised probation for a period of 2 years.

IT IS FURTHER ORDERED that the respondent file an amended proposed probation plan prior to the start of his probation period with the Disciplinary Administrator's office, including a provision providing for an independent audit to assess the amount of client funds, if any, the respondent still possesses that belong to R.K. The provisions of Kansas Supreme Court Rule 211(g)(6)-(12) (2017 Kan. S. Ct. R. 251) apply.

IT IS FURTHER ORDERED that, prior to the termination of probation, respondent file a verified petition for reinstatement pursuant to Kansas Supreme Court Rule 219(b) in which the respondent shall establish compliance with the requirements set out above, including Kansas Supreme Court Rule 218. A reinstatement hearing shall not be required, and reinstatement may occur under the provisions of Kansas Supreme Court Rule 219(c)(1).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

BEIER and BILES, JJ., not participating.

KEVIN P. MORIARTY, District Judge, assigned.[1]

WILLIAM S. WOOLLEY, District Judge, assigned.[2]

---

[1]**REPORTER'S NOTE:** District Judge Moriarty was appointed to hear case No. 115,002 vice Justice Beier under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.

[2]**REPORTER'S NOTE:** District Judge Woolley was appointed to hear case No. 115,002 vice Justice Biles under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.